1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10                               SAN JOSE DIVISION

11

12   THOMAS CORREA,                            Case No.  5:12-cv-05436-HRL

                    Plaintiff,
13
                                               ORDER GRANTING IN PART AND
14         v.                                  DENYING IN PART DEFENDANTS'
                                               MOTION FOR SUMMARY JUDGMENT
15   THE CITY OF SAN JOSE; THE SAN JOSE
     POLICE DEPARTMENT ("SJPD");               Re: Dkt. No. 36
16   MICHAEL SULLIVAN, individually and in
     his official capacity as Lieutenant, SJPD;
17   KIMBERLY HUDSON, individually and in
     her official capacity as Sergeant, SJPD,
18
                    Defendants.
19
           Plaintiff Thomas Correa, a retired officer of the San Jose Police Department (SJPD),

20   claims that defendants retaliated against him when he refused to participate in alleged time card

21   fraud during his employment with SJPD.  The only remaining claim at issue is brought pursuant to

22   42 U.S.C. § 1983 for alleged violation of plaintiff's First Amendment rights.[1]  Defendants move

23   for summary judgment.  Plaintiff opposes the motion.  At the court's direction, each side

24

25   _____

26   [1] Plaintiff also asserted claims for alleged race discrimination (42 U.S.C. § 1981) and common law
     battery.  He has, however, expressly abandoned them.  (See Dkt. 57 at 12 n.12 and Dkt. 80).
27   Additionally, after the instant motion was filed, but before the matter was heard, the court denied
     plaintiff's request for leave to assert a claim for alleged violation of the Public Safety Officers
28   Procedural Bill of Rights.  As to all of these claims, defendants' summary judgment motion is
     denied as moot.

United States District Court
Northern District of California

1   submitted supplemental post-hearing letter briefs.  Upon consideration of the moving and

2   responding papers,[2] as well as the arguments of counsel, the court grants the motion in part and

3   denies it in part.[3]

4   <div align="center">**BACKGROUND**</div>

5       Unless otherwise indicated, the following facts are undisputed.

6       Correa was employed as an officer with SJPD from July 1984 until he retired in May 2011.

7   This lawsuit essentially arises from events that occurred on two days in October 2010, when

8   plaintiff was working the swing shift at the San Jose Mineta International Airport with SJPD's

9   Airport Division.  There, he was a member of a team supervised by (now retired) Sergeant

10  Kimberly Hudson.  Up until the events in question, plaintiff says that he had no problems with

11  Hudson and got along well with her.

12      At that time, SJPD officers worked on what was known as the "4-10 plan," meaning that

13  each officer worked four days per week and ten-hour shifts each day.  Under this arrangement, two

14  teams of officers were required to cover the seven-day week at the airport.  And, on one day per

15  week (usually Wednesday), both teams reported for overlapping shifts, resulting in what was

16  referred to as a "hole" day---i.e., a day on which the Airport Division was double-staffed.

17  According to defendants, on "hole" days, the "in" team would perform its regular duties, while the

18  "out" team performed other exercises and security tasks (e.g., special operations) or filled in

19  wherever needed at the airport.  Correa, on the other hand, alleges that on "hole" days, the two

20  airport teams would take turns having a "free day" on which the "in" team performed its regular

21  duties, while members of the "out" team reportedly goofed off and did no actual work.

22  (Complaint ¶ 9).  There is no dispute, however, that when SJPD training was necessary, the "out"

23

24  [2] Plaintiff submitted a number of exhibits with his opposition papers.  However, none of them
    were authenticated.  Some of them were merely appended to his declaration.  Others were simply

25  submitted to the court with a cover sheet titled, "Plaintiff Tom Correa's Exhibits in Support of
    Opposition to Defendants' Motion for Summary Judgment."  Plaintiff having failed to authenticate

26  any of these documents, defendants' evidentiary objections to them are sustained.  Fed. R. Evid.
    901.  Defendants' evidentiary objections to plaintiff's declaration are addressed in the addendum

27  to this order.

28  [3] All parties have expressly consented that all proceedings in this matter may be heard and finally
    adjudicated by the undersigned.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

<div align="center">2</div>

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

team would use "hole" days to complete that training.

**A. <u>Wednesday, October 20, 2010</u>**

Wednesday, October 20, 2010 was one such training day, and Hudson's team was to report to the site of San Jose's old City Hall for training on active shooters. Previously, officers returning from training on "hole" days would be permitted to work the remainder of their shift and obtain overtime pay. But, times were changing, say defendants. Hudson testified that, pursuant to a directive by Lieutenant Sullivan, no overtime would be permitted for anyone on a training day; and, due to budget constraints, shifts were adjusted on training days to cut overtime. (Richardson Decl., Ex. B (Hudson Depo. at 65:20-66:3,15-25)). To accommodate the October 20 training session, which was scheduled to begin at 1:00 p.m., the team's regular shift hours were adjusted. Instead of reporting for duty at 3:00 p.m. as they normally would, Hudson's team reported for training two hours earlier at 1:00 p.m., and their ten-hour shift was to end two hours earlier at 11:00 p.m. that evening, rather than the usual 1:00 a.m. close of the swing shift.

For the training, defendants say that Hudson ordered her team to wear their tactical uniforms, known as "battle dress uniforms" and commonly referred to as "BDUs." (Richardson Decl., Ex. B (Hudson Depo. at 52:14-53:6, 142:13-144:12); Ex. H (Wong Depo. at 23:11-17)). While plaintiff does not dispute that BDUs were called for, he contends that they were not strictly required. He showed up for training in his "Class A" uniform, i.e., his marked patrol uniform. By all accounts, he was the only one who did so. When Hudson asked Correa why he wasn't wearing his BDU, he replied, "They're at home," and walked away. (Id., Ex. B (Hudson Depo. at 49:9-12)). Hudson considered plaintiff's showing up for training in his Class A uniform to be insubordinate. (Id., Ex. B (Hudson Depo. at 50:5-17)).

For the next several hours, the team proceeded with a formal training module at the old City Hall, followed by qualification at the police shooting range. They then reported to Rosie's, a pizza parlor, for their dinner break. Hudson says that, in addition to the active shooter training, she planned to continue training her team during dinner by having them discuss a recent security incident at the airport and ways to address that issue. (Richardson Decl., Ex. B (Hudson Depo. at 32:3-33:18)).

United States District Court
Northern District of California

1   For his part, plaintiff claims that Hudson's actual plan was to let the team leave work early

2   without finishing their shift.  He personally felt that Hudson had rushed the team through the

3   training scenarios at the old City Hall.  He also says that there was talk among his team that after

4   dinner, they were going to go home, rather than report back to work.  Correa alleges that his team

5   members nonetheless planned to claim on their time sheets that they worked their full 10-hour

6   shift or worked overtime through the regular close of the 1:00 a.m. swing shift.

7   When Correa arrived at the restaurant, everyone except Hudson was there.  Plaintiff says

8   that he was the only one still in full uniform.  He claims that others were wearing a mix of police

9   and civilian clothing, such as BDU cargo pants and civilian t-shirts or jogging pants paired with an

10  untucked patrol shirt.  Embarrassed by his team's appearance, Correa says he lectured them on

11  their "sloppy" dress and for "look[ing] very unprofessional" and said that he was not going to wait

12  for Hudson because he "was hungry" and because he "did not want to have anything to do with

13  time-card fraud."  (Correa Decl. ¶ 8; Richardson Decl., Ex. A (Correa Depo. at 162:21)).  Correa

14  further testified that, after another officer reiterated that they would get to go home after they ate,

15  he replied, "[N]ot me.  Count me out."  (Richardson Decl., Ex. A (Correa Depo. at 161:23-25)).

16  Correa got in his car to leave, and as he pulled out of Rosie's parking lot, he saw Hudson

17  walking toward the restaurant.  Through his car window, plaintiff told her that he was leaving

18  because he "was very hungry" and "could not wait any longer."  (Correa Decl. ¶ 8:11-12).  Then,

19  he drove off.  Hudson testified that she was puzzled by plaintiff's comment because there was

20  absolutely no line at the restaurant.  Nevertheless, she expected that Correa would get his dinner

21  elsewhere and then report back to the team.

22  Correa did eat his dinner elsewhere, but he never returned to the team at Rosie's.  He

23  points out that October 20 was the day of the National League Championship Series between the

24  San Francisco Giants and the Philadelphia Phillies, and that the game was broadcast on television

25  sets at the restaurant.  In his view, the notion that any actual training would occur during the

26  team's dinner break was ludicrous.  So, after eating his dinner, rather than return to Rosie's, he

27  decided to go to the airport.

28  Meanwhile, back at Rosie's, Hudson wondered about plaintiff and asked the team if they

4

United States District Court
Northern District of California

1    knew where he was.  Plaintiff testified that, as he entered the airport parking lot, he received a text

2    message from fellow team member Officer Steven Kelly:   "He texted me saying you are coming

3    back, right.  I said I am at the airport now.  I am going to work.  Then he texted back no, no, no,

4    no."  (Richardson Decl., Ex. A (Correa Depo. at 164:1-3)).  Plaintiff said he took Kelly's reply

5    "no, no, no, no" to mean "That is a mistake, you dummy.  This is a free night.  What are you doing

6    going back to work?"  (Id. (Correa Depo. at 164:5-6)).

7            As it turns out, Sergeant Eric Phan, who was on duty supervising the airport's "in" team,

8    was short-staffed that night because one of his officers went home sick.  Correa volunteered to fill

9    in for that officer and to work two hours of overtime until the regular 1:00 a.m. close of the swing

10   shift.

11           A series of phone calls then ensued between plaintiff, Hudson, and Phan---both Hudson

12   and Correa lost their tempers, and Phan intervened.  In sum, Hudson ordered Correa to return to

13   the team at Rosie's and he refused.  According to plaintiff, Hudson called him, angry and yelling,

14   and ordered him to return to Rosie's.  Correa says that he "told her that I was already at the

15   Airport, that they were short-handed.  I told her that she needed to speak with the Sergeant on

16   duty, Eric Phan, if she has a problem with this."  (Correa Decl. ¶ 10).  Plaintiff claims that Hudson

17   then began yelling incoherently.  So, he hung up on her.  Hudson testified that she was angry

18   because she was not used to having her orders so blatantly disregarded.  (Richardson Decl., Ex. B

19   (Hudson Depo. at 55:25-56:11)).

20           Hudson then called Phan and directed him to send Correa back to her team, stating that

21   they were in training and no overtime was authorized for anyone.  (Richardson Decl., Ex. B

22   (Hudson Depo. at 64:13-24, 72:3-11; 72:25-74:1)).  Phan relayed Hudson's message to Correa,

23   who became upset.  Correa told Phan that he felt that he was being punished for returning to work

24   and filling in for a sick officer.  Plaintiff explained that he left the restaurant because he was

25   embarrassed by his team and preferred to finish his shift at the airport.  Additionally, Correa asked

26   Phan to call Hudson and tell her that if anyone on the team left early or worked overtime, he

27   would report it to Lt. Sullivan.  Phan assured plaintiff that he would call Hudson and relay that

28   message.  (Id., Ex. D (Phan Depo. at 34:2-23)).

United States District Court
Northern District of California

1    Plaintiff also called Hudson and left a voicemail message for her.  He testified in

2   deposition:  "I laid it down on her.  I said this has to stop.  I am here working.  I don't want to

3   participate in this free night.  You guys could do what you want.  Count me out.  Leave me alone.

4   Quit harassing me.  If you have a problem, talk to Eric Phan because I am sick of it, okay.  Leave

5   me alone.  As far as I am concerned this is over, okay.  I am going to work.  You can't force me."

6   (Richardson Decl., Ex. A (Correa Depo. at 164:23-164:5)).  Viewing Hudson's repeated orders to

7   return to her team as harassment, plaintiff said that he also told her that he would "take this to

8   another level [i.e., report the situation to Sullivan] if [Hudson] decide[d] to make this an issue."

9   (Id., Ex. A (Correa Depo. at 165:8-9); Complaint ¶ 18).

10    Hudson played Correa's voicemail for the rest of the team, she says, to show them his tone

11   and how he was yelling.  (Richardson Decl., Ex. B (Hudson Depo. at 90:12-21)).  Hudson says

12   that, in his voicemail, plaintiff complained that if he couldn't take any overtime, then everyone

13   else on the team had better not take any overtime either.  (Id., Ex. B (Hudson Depo. at 87:12-15,

14   95:6-8)).  Hudson says that no overtime was allowed for anyone, that she never let anyone leave

15   without completing their shift, and that she was not sure why plaintiff was making these

16   statements; so, she asked the rest of the team, "Does anybody know what's going on with

17   Tommy?"  (Id. (Hudson Depo. at 65:20-23, 66:4-14, 87:16-19)).

18    Phan eventually persuaded Hudson to permit Correa to fill in for the sick officer, through

19   the 1:00 a.m. close of the swing shift, assuring her that he (Phan) would take full responsibility for

20   Correa for the remainder of the shift.  (Richardson Decl., Ex. D (Phan Depo. at 42:11-24)).

21   Additionally, because tempers had flared, Phan convinced Hudson not to confront plaintiff that

22   evening.  (Id., Ex. B Hudson Depo. at 205:14-24)).

23    Plaintiff claims that Phan told him that the team was returning to the airport and that they

24   were upset with him for ruining their "free night."  (Correa Decl. ¶ 14).  Ultimately, Correa says

25   that, in order to avoid any problems, he decided to leave by 11:00 p.m., but insisted that everyone

26   on the team also had to leave by 11:00 p.m.---or else, he would call for a meeting with Sullivan.

27   (Correa Decl. ¶ 13).  Plaintiff worked until 11:00 p.m. and then went home.

28    Hudson's team returned to the airport, she estimates, around 9:00 p.m.  (Richardson Decl.,

6

Ex. B (Hudson Depo. at 89:18-90:2)).  She testified that she took her team to training, and then everyone went home.  (Id., Ex. B (Hudson Depo. at 95:12-15)).  There is no evidence that anyone on the team left work early or worked (or claimed) overtime.

### B.  Sunday, October 24, 2010

Sunday, October 24, 2010, was the team's first day back at work after the October 20 training day.  At the start of the shift, the team was assembled in the briefing room, along with Hudson and Sergeant Joe Hernandez.  There is no dispute that, following the daily briefing, a heated argument erupted between Correa and Hudson.  The parties differ, however, in their characterization of events leading to up to it.

In plaintiff's version:   After the daily briefing, Hudson yelled, "Thomas I need you in my office now!" (Correa Decl. ¶ 17).  Plaintiff responded, "Why?  Is it because of what happened Wednesday?  Why?  To punish me again?  You already punished me." (Id. ¶ 18).  Hudson reportedly said, "You defied my order.  Come, let's go."  (Id.).  Plaintiff claims he then requested that another person be present in the room, but Hudson allegedly replied, "Can't have one."  (Id.).  Correa says that he told Hudson, "You are going to discipline me again.  I know my rights.  I demand a third party.  I will not tolerate this.  I am being punished for standing up against timesheet fraud."  (Id.).  Plaintiff claims that Hudson then suddenly jumped up from her chair, pointed her finger rapidly up and down, and with a red face, said, "You wanna go home?  You wanna go home?  I can send your ass home right now."  (Id. ¶ 19; see also Richardson Decl., Ex. G (Kennedy Depo. at 42:6-13)).  Correa claims that he believed Hudson was being totally irrational, and he said "I do not need to take this, I know my rights."  (Id.).

According to defendants, Hudson wanted to talk with Correa because she was concerned about him.  She testified that plaintiff "never behaved like that," and she "had no idea what was going on with him."  (Richardson Decl., Ex. B (Hudson Depo. at 96:16-22)).  Hudson testified that, in a calm voice, she said, "Tommy, can I see you?  Can I see you in my office?"  Correa then allegedly started yelling about discipline and wanting a union representative.  Hudson says that she responded, "Well, it's not—it's not that kind of conversation, Tommy."  Plaintiff then demanded a witness; Hudson looked over at Sgt. Hernandez and said, "Joey?"; and Hernandez

7

said, "Sure." Hudson says she told plaintiff, "Okay. Sgt. Hernandez will be there." (Id. at 99:16-22).

Correa, however, turned to leave the briefing room, saying, "I'm 6-1-David-5," meaning that he was going to his assigned patrol at the outer perimeter of the airport. (Richardson Decl., Ex. A (Correa Depo. at 85:9-11)). Plaintiff says that Hudson then grabbed his belt, causing him to stumble. (Correa Decl., ¶ 20). Hudson says that she reached for his belt, but did not manage to grab it. She claims that, for safety reasons, her intent was to stop Correa from going on patrol in what she considered to be a bad state of mind. (Richardson Decl., Ex. B (Hudson Depo. at 121:8-24)). Correa then yelled, "You fucking coward, you bitch, do not ever touch me again. I can easily fuck you up right now, but I won't." (Correa Decl., ¶ 21). In plaintiff's version of events, Hudson hopped up and down and, with L-shaped arms and closed fists, began shadow boxing and saying, "I'm not backing down." She allegedly then rushed toward Correa, until other officers restrained her. (Id. ¶ 23).

Sgt. Hernandez stepped between the two and told Hudson to go to her office, and Hudson called Sullivan.

Sullivan arrived about 40 minutes later and first spoke with Hudson in her office. At that time, Hudson felt that they should take plaintiff's gun and badge and that he should be removed from her team, placed on administrative leave, and evaluated for fitness for duty. (Richardson Decl., Ex. B (Hudson Depo. at 137:14-20)).

Sullivan then called plaintiff into the office. Rather than allowing Correa to give his side of the story, plaintiff says that Sullivan and Hernandez advised him not to speak because anything he said could be used against him. Sullivan then reportedly read from a pre-printed card, advising Correa that he was the subject of a department-initiated complaint involving, among other things, insubordination and conduct unbecoming an officer. Sullivan told Correa to get a union representative, and sent him home for the day (with pay), with instructions to report back to work the following day at 3:00 p.m. for a meeting to discuss what happened. (Correa Decl. ¶¶ 25-26; Richardson Decl., Ex. A (Correa Depo. at 95:1-14)).

The next day, Correa met with Sullivan and Deputy Chief David Cavallero in Cavallero's

United States District Court
Northern District of California

1   office.  Plaintiff claims that Cavallero had "unfit for duty" forms on his desk.  But, instead of

2   relieving plaintiff of his gun and badge, Cavallero and Sullivan sent him home on two weeks paid

3   leave and ordered him to see a psychologist, who later cleared plaintiff to return to duty.  (Correa

4   Decl. ¶ 27).  In deposition, Correa testified that he did not consider anything that happened in that

5   meeting to be retaliatory, that he felt he had been treated fairly, and that Sullivan and Cavallero

6   were resolving the situation the way he wanted.  (Richardson Decl., Ex. A (Correa Depo. at

7   105:12-106:3)).

8          **C.  <u>Subsequent Events</u>**

9        When plaintiff returned to work, he was transferred from Hudson's team and instead

10  reported to Phan.  He claims that from that point on, he had no interaction with Hudson.

11  (Richardson Decl., Ex. A (Correa Depo. at 121:8-10)).  He says he viewed the change as an

12  adverse employment decision because it meant switching to what, he claims, is the less desirable

13  graveyard shift at the airport.  Nevertheless, he accepted the change and supported it

14  "[a]bsolutely" because he "want[ed] peace the way it was before" and "want[ed] everything back

15  to normal the way it was before [he] said no to time sheet fraud."  (Richardson Decl., Ex. A

16  (Correa Depo. at 115:14-116:5)).  Sullivan felt that the change was best for everyone because it

17  separated Correa and Hudson and placed Correa with a supervisor that he would work with well.

18  (<u>Id.</u>, Ex. C (Sullivan Depo. at 136:10-21)).

19        Meanwhile, Hudson complained that Correa looked at her the wrong way and continued

20  with behavior that created a hostile work environment.  She reported to Phan and Sullivan that the

21  situation was escalating.  (Richardson Decl., Ex. A (Hudson Depo. at 185:3-11, 126:20-127:12,

22  137:2-6)).  As such, Sullivan says he made the decision to transfer Correa out of the Airport

23  Division, back to patrol under the supervision of Lt. Paul Francois.  (<u>Id.</u>, Ex. A (Correa Depo. at

24  129:7-130:2); Ex. C (Sullivan Depo. at 131:3-9)).  That decision, says Sullivan, was made as a

25  matter of safety.  (<u>Id.</u>, Ex. C (Sullivan Depo. at 131: 19-25)).  Although plaintiff testified that he

26  "love[d] patrol," he viewed this transfer as an adverse employment action because he says he had

27  been minding his own business and felt he did nothing wrong to be told to leave the Airport

28  Division.  (<u>Id.</u>, Ex. A (Correa Depo. at 91:25, 131:23-132:4)).

United States District Court
Northern District of California

1   After plaintiff learned that he was being investigated by Internal Affairs for misconduct

2   based on Hudson's complaint, he filed a counter-complaint against her for assault based on the

3   argument that erupted in the briefing room.

4   Meanwhile, Hudson's Internal Affairs complaint was referred to a disciplinary review

5   panel.  According to plaintiff, Francois told him that harsh discipline was likely, possibly

6   termination.  Plaintiff, who had been eligible to retire since 2008, says he felt that the disciplinary

7   process had been completely one-sided.  So, Correa says he decided to retire before any discipline

8   could be imposed.  (Correa Decl. ¶ 30; Richardson Decl., Ex. A (Correa Depo. at 53:23-24, 57:6-

9   15).

10   Correa never reported any time card fraud during his tenure with SJPD, and he does not

11   claim that he suffered retaliation for complaining of fraud by members of SJPD.[4]  (Richardson

12   Decl., Ex. A (Correa Depo. at 52:23-25)).  Rather, he contends that defendants retaliated against

13   him for resisting their efforts "to make [him] commit time sheet fraud."  (Id. at 160:19-20).

14   Defendants argue that Correa did not engage in any protected speech and that this lawsuit is based

15   on nothing more than a personal grievance over the two hours of overtime Correa felt he should

16   have gotten on October 20.

17   ## LEGAL STANDARD

18   A motion for summary judgment should be granted if there is no genuine issue of material

19   fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

20   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party bears the initial

21   burden of informing the court of the basis for the motion, and identifying portions of the

22   pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the

23   absence of a triable issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In

24   order to meet its burden, "the moving party must either produce evidence negating an essential

25   element of the nonmoving party's claim or defense or show that the nonmoving party does not

26

27   [4] Plaintiff testified that he complained to the Independent Police Auditor in February 2012.
(Richardson Decl., Ex. A (Correa Depo. at 171:11-172:3)).  Because those complaints were made

28   nearly a year after he retired, however, they cannot be the basis for his retaliation claim against
defendants.

1  have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

2  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1102 (9th Cir. 2000).

3      If the moving party meets its initial burden, the burden shifts to the non-moving party to

4  produce evidence supporting its claims or defenses.  See Nissan Fire & Marine Ins. Co., Ltd., 210

5  F.3d at 1102.  The non-moving party may not rest upon mere allegations or denials of the adverse

6  party's evidence, but instead must produce admissible evidence that shows there is a genuine issue

7  of material fact for trial.  See id.  A genuine issue of fact is one that could reasonably be resolved

8  in favor of either party.  A dispute is "material" only if it could affect the outcome of the suit

9  under the governing law.  Anderson, 477 U.S. at 248-49.

10      "When the nonmoving party has the burden of proof at trial, the moving party need only

11  point out 'that there is an absence of evidence to support the nonmoving party's case.'"

12  Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting Celotex Corp., 477 U.S. at

13  325).  Once the moving party meets this burden, the nonmoving party may not rest upon mere

14  allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine

15  issue for trial.  Id.

## DISCUSSION

17      To establish a claim for retaliation for engaging in protected speech in violation of the First

18  Amendment, a plaintiff must show that:  (1) he engaged in protected speech; (2) he suffered an

19  adverse employment action; and (3) his speech was a substantial motivating factor for the adverse

20  employment action.  Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003).

21      "The First Amendment shields public employees from employment retaliation for their

22  protected speech activities."  Hagen v. City of Eugene, 736 F.3d 1251, 1257 (9th Cir. 2013) (citing

23  Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S. Ct. 1951, 1957 (2006)).  In assessing such claims,

24  courts must "arrive at a balance between the interests of the [public employee], as a citizen, in

25  commenting upon matters of public concern and the interest of the State, as an employer, in

26  promoting the efficiency of the public services it performs through its employees."  Id. (quotations

27  and citations omitted).  This analysis is made through a five-step balancing test---the first two

28  prongs address whether the speech is protected under the First Amendment, and the remaining

United States District Court
Northern District of California

11

three consider whether that protected speech caused some retaliatory response:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009).  All of these factors are necessary, and the "failure to meet any one of them is fatal to the plaintiff's case." Dahlia v. Rodriguez, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013).

### A. Did plaintiff speak on a matter of public concern?

Plaintiff bears the burden of showing that the speech in question addressed a matter of public concern, an inquiry that presents a question of law. Eng, 552 F.3d at 1070.  The Ninth Circuit has resisted precisely defining what constitutes a matter of public concern, but "the essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest." Desrochers v. City of San Bernardino, 572 F.3d 703, 709 (9th Cir. 2009) (quoting Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

"Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." Eng, 552 F.3d at 1070 (citations omitted).  "But speech that deals with individual personnel disputes and grievances and that would be of no relevance to the public's evaluation of the performance of governmental agencies is generally not of public concern." Id. (citations omitted).  "The same is true of speech that relates to internal power struggles within the workplace, and speech which is of no interest beyond the employee's bureaucratic niche." Desrochers, 572 F.3d at 710.  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103 S. Ct. 1684; see also Eng, 552 F.3d at 1070 (same).

"First and foremost," the court "consider[s] the content of the speech, the greatest single factor in the Connick inquiry." Desrochers, 752 F.3d at 710 (internal quotation marks and citation

United States District Court
Northern District of California

12

1  omitted).  The content of the subject communication "must be of broader societal concern," and

2  the court's "focus must be upon whether the public or community is likely to be *truly interested* in

3  the particular expression, or whether it is more properly viewed as essentially a private grievance."

4  Id. at 713 (citation and quotations omitted).

5       The content of Correa's October 20 speech demonstrates that his statements concerned his

6  objection to treating that "hole" day as a "free day," and specifically, to his team's alleged plans to

7  submit timesheets for time (or overtime) that they had not actually worked.  Defendants contend

8  that the speech at issue concerned nothing more than a personal grievance over the two hours of

9  overtime Correa wanted.  But, events giving rise to plaintiff's speech began earlier in time---at

10  Rosie's, he told his teammates to "Count [him] out" when an officer reportedly remarked that

11  everyone would get to go home after they finished dinner.  (Richardson Decl., Ex. A (Correa

12  Depo. at 161:23-25)).  He subsequently told Hudson in a voicemail that he wouldn't "participate

13  in this free night" and that he was "going to work" at the airport.  (Id., Ex. A (Correa Depo. at

14  164:23-165:5)).  And, he told Hudson (via Phan) that if anyone on the team left early or worked

15  overtime, he would report it to Sullivan.  (Id. Ex. D (Phan Depo. at 34:2-23)).  His speech dealt

16  with alleged fraudulent claims for compensation---matters which this court finds are matters of

17  public concern, not purely private issues.  See Thomas v. City of Beaverton, 379 F.3d 802, 809

18  (9th Cir. 2004) ("Unlawful conduct by a governmental employee or illegal activity within a

19  government agency is a matter of public concern."); Johnson v. Multnomah Cnty., 48 F.3d 420,

20  425 (9th Cir. 1995) (stating that "misuse of public funds, wastefulness, and inefficiency in

21  managing and operating government entities are matters of inherent public concern.").

22       With respect to the form of plaintiff's speech, his statements were made only within the

23  department and were never directed to the public.  That fact, however, is not dispositive.  See, e.g.,

24  Anthoine v. North Central Counties Consortium, 605 F.3d 740, 748-49 (9th Cir. 2010)

25  (concluding that the speech at issue qualified as a matter of public concern, even though plaintiff's

26  statements were conveyed to the chairman of defendant's governing board during a meeting at a

27  restaurant).  Even so, "[a] limited audience weigh[s] against [a] claim of protected speech."

28  Desrochers, 752 F.3d at 714 (quotation marks and citation omitted).  Thus, when speech takes the

United States District Court
Northern District of California

13

1    form of an internal employee grievance that is not disseminated to the public, "this portion of the

2    *Connick* test cuts against a finding of public concern." Id. at 715.

3          As for context, the court is to look at "the *point* of the speech." Desrochers, 752 F.3d at

4    715. "In other words, why did the employee speak (as best as we can tell)? Does the speech 'seek

5    to bring to light actual or potential wrongdoing or breach of public trust,' or is it animated instead

6    by 'dissatisfaction' with one's employment situation?" Id. (quoting Connick, 461 U.S. at 148, 103

7    S. Ct. 1684). For the reasons discussed above, this court does not find that the speech at issue was

8    driven by an internal grievance over the two hours of overtime Correa volunteered to work.

9    Rather, viewing the record in the light most favorable to plaintiff, and drawing all reasonable

10    inferences in his favor, the record indicates that he spoke because he did not approve of, and

11    refused to go along with, his team's alleged plans to submit fraudulent timesheets. True, Correa

12    initially did not speak for the purpose of disclosing or revealing the alleged intended wrongdoing.

13    He told Hudson and his teammates that they "could do what [they] wanted," so long as they left

14    him alone. (Richardson Decl., Ex. A (Correa Depo. at 164:23-165:5)). However, he did

15    subsequently tell Hudson (through Phan) that if the team committed timesheet fraud, he would

16    report it to Sullivan.

17          So, although the October 20 speech at issue was made to a limited audience within the

18    SJPD, this court finds that the content and context of those statements weigh in favor of finding

19    that it qualifies as protected speech.

20          Not so for the October 24 speech at issue. Although plaintiff did say that he felt he was

21    being punished for opposing timesheet fraud, the content of plaintiff's speech on that day did not

22    concern his objections to timesheet fraud. Rather, the gist of his speech was that he felt he had

23    been treated unfairly. See Thomas, 379 F.3d at 808 ("[T]he type of personnel matters that we

24    have deemed unprotected under the public concern tests are employment grievances in which the

25    employee is complaining about her *own* job treatment, not personnel matters pertaining to

26    others."). Again, this speech was made within the office. And, nothing about the context suggests

27    that plaintiff made the speech for the purpose of bringing to light any alleged timesheet fraud.

28    Accordingly, the court concludes that plaintiff's October 24 speech did not pertain to a matter of

United States District Court
Northern District of California

14

United States District Court
Northern District of California

1  public concern.

2       Having concluded that the October 20 speech pertained to matters of public concern, this

3  court moves to the next step in the analysis.

4       **B.      Did plaintiff speak as a public employee or private citizen?**

5       The First Amendment does not protect a public employee's speech made pursuant to the

6  employee's official duties.  Garcetti v. Ceballos, 547 US. 410, 421, 126 S. Ct. 1951, 164 L.Ed.2d

7  689 (2006); Hagen, 736 F.3d at 1257.  Correa bears "the burden of showing the speech was

8  spoken in the capacity of a private citizen and not a public employee."  Eng, 552 F.3d at 1071.

9  "Statements are made in the speaker's capacity as citizen if the speaker had no official duty to

10  make the questioned statements, or if the speech was not the product of performing the tasks the

11  employee was paid to perform."  Id. (internal quotations and citations omitted).

12       "While the question of the scope and content of a plaintiff's job responsibilities is a

13  question of fact, the ultimate constitutional significance of the facts as found is a question of law."

14  Eng, 552 F.3d at 1071 (internal quotations and citations omitted).  But, "when there are genuine

15  and material disputes as to the scope and content of the plaintiff's job responsibilities, the court

16  must reserve judgment on [whether the plaintiff's speech was pursuant to his official duties] . . .

17  until after the fact-finding process."  Dahlia, 735 F.3d at 1072 (quoting Posey v. Lake Pend Oreille

18  School Dist. No. 84, 546 F.3d 1121, 1123 (9th Cir. 2008)).  And, the Ninth Circuit continues to

19  adhere to the view that when an inquiry "is a mixed question of law and fact, . . . it will often be

20  inappropriate to take the question from the jury."  Id. at n.12.

21       Determining whether an officer acted pursuant to his official duties requires a "practical"

22  approach.  Dahlia, 735 F.3d at 1069 (citing Garcetti, 547 U.S. at 424-25).  "Precisely because of

23  the fact-intensive nature of the inquiry, no single formulation of factors can encompass the full set

24  of inquiries relevant to determining the scope of a plaintiff's job duties."  Id. at 1074.

25  Nevertheless, the Ninth Circuit in Dahlia provided "a few guiding principles" in making that

26  determination.  Id.  "First, particularly in a highly hierarchical employment setting such as law

27  enforcement, whether or not the employee confined his communications to his chain of command

28  is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his

15

United States District Court
Northern District of California

1    official duties." <u>Id.</u>  By contrast, "[w]hen a public employee communicates with individuals or

2    entities outside of his chain of command, it is unlikely that he is speaking pursuant to his duties."

3    <u>Id.</u>  So, for example, in <u>Freitag v. Ayers</u>, the Ninth Circuit held that the plaintiff correctional

4    officer's internal reports of inmate sexual misconduct and her documentation of the prison's

5    failure to respond were made pursuant to her official duties, but that she nevertheless spoke as a

6    private citizen when she reported those same incidents to a state senator and to the state inspector

7    general.  468 F.3d 528, 545-46 (9th Cir. 2006).

8            Second, if the subject matter of the speech raises "within the department broad concerns

9    about corruption or systemic abuse," such complaints are unlikely to fall within an average public

10   employee's job duties, unless the employee works for a "watchdog unit," such as Internal Affairs.

11   <u>Dahlia</u>, 735 F.3d at 1075.  On the other hand, "[w]hen an employee prepares a routine report,

12   pursuant to normal departmental procedure, about a particular incident or occurrence, the

13   employee's preparation of that report is typically within his job duties."  <u>Id.</u>

14           Third, if the speech is made in direct contravention to a supervisor's orders, then it likely

15   falls outside of the public employee's professional responsibilities.  <u>Dahlia</u>, 735 F.3d at 1075.

16   "Indeed, the fact that an employee is threatened or harassed by his superiors for engaging in a

17   particular type of speech provides strong evidence that the act of speech was not, as a 'practical'

18   matter, within the employee's job duties notwithstanding any suggestions to the contrary in the

19   employee's formal job description."  <u>Id.</u>  That is because "[f]ormal job descriptions often bear

20   little resemblance to the duties an employee actually is expected to perform, and the listing of a

21   given task in an employee's written job description is neither necessary nor sufficient to

22   demonstrate that conducting the task is within the scope of the employee's professional duties for

23   First Amendment purposes."  <u>Garcetti</u>, 547 U.S. at 424-25, 126 S. Ct. 1951.

24           On the record presented, this court cannot grant summary judgment for defendants because

25   they have not carried their burden of demonstrating that there is an absence of evidence to support

26   Correa's case.  In opposition to defendants' motion, Correa submitted a declaration in which he

27   avers:  "My job was to provide visible security for the Airport and the surrounding area.  I had no

28   freestanding duty, or authority to report, or investigate wrongdoing of a superior officer like Sgt.

16

Hudson." (Correa Decl. ¶ 2:9-11). Defendants do not refute that assertion and have presented no

evidence to the contrary. Instead, they argue that the speech at issue "occurred in the regular

course and scope of [plaintiff's] employment" because the statements were made while plaintiff

was on duty and were limited to officers in the chain of command.[5] (See Dkt. 36 at ECF 13, 14).

But, that fact is not dispositive. Dahlia, 735 F.3d at 1074. Defendants otherwise argue, in highly

conclusory fashion and without elaboration, that "[t]he additional analysis required by the *Dahlia*

opinion confirms Plaintiff's speech and related conduct occurred in the regular course of his duties

as a San Jose Police Officer." (Dkt. 36 at ECF 15). This showing is insufficient to avoid trial on

this issue.

### C.   Remaining Factors

As for the remaining factors in the balancing test, and with one exception (discussed

below), this court finds that genuine issues of material fact preclude summary judgment.

At the third step, plaintiff bears the burden of showing that defendants took adverse

employment action and that the speech at issue was a substantial or motivating factor in the

adverse action. Eng, 552 F.3d at 1071. This inquiry is purely a question of fact. Id. "To

constitute an adverse employment action, a government act of retaliation need not be severe and it

need not be of a certain kind. Nor does it matter whether an act of retaliation is in the form of the

removal of a benefit or the imposition of a burden." Coszalter, 320 F.3d at 975. "In a First

Amendment retaliation case, an adverse employment action is an act that is reasonably likely to

deter employees from engaging in constitutionally protected speech." Id. at 970.

At step 4, defendants have the burden to show that their legitimate administrative interests

outweigh plaintiffs' First Amendment rights. Eng, 552 F.3d at 1071. This inquiry "asks 'whether

the relevant government entity had an adequate justification for treating the employee differently

from any other member of the general public.'" Id. (quoting Garcetti, 547 U.S. at 418, 126 S. Ct.

---

[5] Plaintiff points out that some of the speech at issue was made to his fellow officers just before he left Rosie's. This court, however, finds no constitutional significance in that fact. See, e.g., Hagen, 736 F.3d at 1258 (concluding that the plaintiff officer complained up the chain of command, even where "[t]he evidence establishes that his concerns were directed to his coworkers and his superior officers.").

United States District Court
Northern District of California

1951).  Although this inquiry is ultimately a question of law, its resolution often entails underlying factual disputes.  Id.

If defendants fail to carry their burden at step 4, then at step 5 they bear the burden of showing that they would have reached the same adverse employment decisions, even in the absence of plaintiff's protected conduct.  Eng, 552 F.3d at 1072.  "In other words, [defendants] may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action."  Id.  This inquiry is purely a question of fact.  Id.

On this record, there are genuine issues of material fact whether defendants legitimately transferred Correa for safety reasons and pursued disciplinary proceedings against him for misconduct or whether defendants did those things because he refused to go along with his team's alleged plans to commit timesheet fraud and threatened to report them if they went through with those plans.  For example, Correa testified that after being transferred to Phan's team, he had no further interaction with Hudson, minded his own business, and did nothing to warrant being transferred out of the Airport Division.  (Richardson Decl., Ex. A (Correa Depo. at 121:8-10, 131:23-132:4)).  Defendants, however, maintain that plaintiff was insubordinate, essentially had a "meltdown" in the briefing room, and continued with behavior that created a hostile work environment.  (Id., Ex. B (Hudson Depo. at 185:3-11, 126:20-127:12, 137:2-6)).

However, insofar as Correa bases his retaliation claim on the October 25 meeting with Sullivan and Cavallaro (including the decision to put him on two-weeks paid leave, with instructions to see a psychologist), defendants' summary judgment motion is granted because no reasonable jury could conclude that those incidents constituted retaliation.  Plaintiff testified that that he did not consider anything that happened in the October 25 meeting with Sullivan and Cavallaro to be retaliatory, that he felt he had been treated fairly, and that they were resolving the situation the way he wanted.  (Richardson Decl., Ex. A (Correa Depo. at 105:12-106:3)).

**D.     Qualified Immunity**

Defendants nevertheless maintain that Sullivan and Hudson are entitled to qualified

immunity.[6]  Under <u>Saucier v. Katz</u>, 533 U.S. 194, 194 (2001), the court undertakes a two-step analysis to determine whether qualified immunity applies:  First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show [that] the officer's conduct violated a constitutional right?"  <u>Id.</u> at 201.  "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity.  <u>Id.</u>  But if there appears to have been a constitutional violation, the court must determine whether the constitutional right in question was "clearly established."  <u>Id.</u>  If the right is not clearly established at the time of the violation, then the officer is entitled to qualified immunity.  Although the <u>Saucier</u> sequence is often appropriate and beneficial, it is not mandatory.  A court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case.  <u>See</u> <u>Pearson v. Callahan</u>, 555 U.S. 223, 235-36 (2009).

As discussed above, there are triable fact issues as to whether a constitutional violation occurred.  But, even assuming that plaintiff establishes that a violation occurred, the right in question was not clearly established at the time of the alleged violation.  In <u>Huppert v. City of Pittsburg</u>, the Ninth Circuit held, as a matter of law, that whistleblowing on fellow officers is part of a police officer's official duties.  574 F.3d 696 (2009); <u>see also</u> <u>Dahlia v. Rodriguez</u>, 689 F.3d 1094, 1105 (9th Cir. 2012).  Although <u>Huppert</u> has since been overruled, <u>see</u> <u>Dahlia</u>, 735 F.3d at 1071, at the time of the events in question, it was the rule of law in this circuit.  Accordingly, insofar as they were sued in their individual capacities, defendants Sullivan and Hudson are entitled to qualified immunity.

## ORDER

Based on the foregoing, it is ordered that defendants' summary judgment motion is granted in part and denied in part.

This matter is set for a Final Pretrial Conference on December 10, 2015, 1:30 p.m.  At that

---

[6] Defendants Sullivan and Hudson were sued in their individual and official capacities, along with the SJPD and the City of San Jose.  Qualified immunity, however, is not available to municipalities or to individuals in their official capacities.  <u>Eng</u>, 552 F.3d at 1064 n.1.  This portion of this order therefore addresses only Sullivan and Hudson in their individual capacities.

United States District Court
Northern District of California

time, the parties shall be prepared to discuss dates for trial.[7]  Additionally, the parties shall comply with the undersigned's Standing Order re: Pretrial Preparation with regard to the timing and content of the Joint Pretrial Statement, and other pretrial submissions.[8]

Further, the parties are referred to Magistrate Judge Cousins for a settlement conference to take place prior to the Final Pretrial Conference, subject to available dates on Judge Cousin's calendar.

SO ORDERED.

Dated:   September 16, 2015

_____
HOWARD R. LLOYD
United States Magistrate Judge

United States District Court
Northern District of California

---

[7] The parties shall meet-and-confer and come up with five or six dates (over several months) that are available to the parties, their counsel, and any witnesses to be called.  Subject to changes to its current calendar, the court anticipates that trial may be set anywhere from 2-4 months from the date of the pretrial conference.

[8] Parties may obtain copies of all of this court's standing orders from the Clerk of the Court, or on the court's website http://cand.uscourts.gov.

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ADDENDUM:  DEFENDANTS' OBJECTIONS TO PLAINTIFF'S DECLARATION**

Paragraph 1

- lines 6-7:                                          Sustained.  Fed. R. Evid. 802.

Paragraph 2

- line 9:                                              Sustained.  Fed. R. Evid. 602.
- line 13:                                            Sustained.  Fed. R. Evid. 802.

Paragraph 3 (entirety):                             Sustained.  Fed. R. Evid. 602, 802.

Paragraph 4

- line 19 ("Until . . . 2011"):              Sustained.  Fed. R. Evid. 602.
- lines 19-22 ("SJPD . . .day"):         Overruled.
- lines 22-28 ("Because . . .etc."):      Sustained.  Fed. R. Evid. 602.

Paragraph 5

- sentence 1:                                      Sustained.  Fed. R. Evid. 602.
- sentence 7:                                      Sustained.  Fed. R. Evid. 602.
- sentence 8:                                      Overruled.
- sentence 10-11          :               Overruled.

Paragraph 6

- sentence 1:                                      Overruled.
- sentence 2:                                      Overruled.
- sentence 3:                                      Sustained.  Fed. R. Evid. 602, 802.
- sentence 4 ("The plan . . .Parlor"):    Overruled.
- sentence 4 ("a well-known . . . personnel"):  Sustained.  Fed. R. Evid. 602, 802.

Paragraph 7

- sentence 1 ("As ordered. . . so"):      Sustained.  Fed. R. Evid. 602, 802.
- sentence 3 ("I was . . . way"):          Sustained.  Fed. R. Evid. 802.
- sentence 8                                        Overruled.
- footnote 1:                                        Sustained.  Fed. R. Evid. 602.

Paragraph 8

- sentence 6:                                      Overruled.

Paragraph 9

- sentence 2, 4:                    Overruled.

Paragraph 10

- sentence 1:                       Overruled.
- sentence 2:                       Overruled.

Paragraph 11

- sentence 1, 3-4:                  Sustained.  Fed. R. Evid. 602, 802.
- sentence 2:                       Overruled.
- sentence 6:                       Overruled.
- sentence 7:                       Overruled.

Paragraph 12

- sentences 3-4:                    Overruled.

Paragraph 13

- sentence 4 ("and they. . . trusted")   Sustained.  Fed. R. Evid. 602, 802.

Paragraph 14

- sentence 1:                       Overruled.
- sentence 2:                       Overruled.
- sentence 3:                       Overruled.

Paragraph 15

- sentence 1:                       Overruled.
- sentence 2:                       Sustained.  Fed. R. Evid. 602, 802.

Paragraph 16

- sentence 1-3 ("a number . . . job"):   Sustained.  Fed. R. Evid. 602, 802.

Paragraph 17

- sentence 2:                       Overruled.

Paragraph 18

- sentence 2, 4, 6:                 Overruled.
- footnote 1:                       Sustained.  Fed. R. Evid. 602.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

Paragraph 19

- sentence 1:                                    Overruled.

Paragraph 23

- sentence 2:                                    Overruled.

Paragraph 24

- sentence 2:                                    Overruled.

Paragraph 25

- sentence 3:                                    Sustained.  Fed. R. Evid. 602, 802.

Paragraph 28

- sentence 3:                                    Sustained.  Fed. R. Evid. 802.

Paragraph 29

- sentence 1 ("In a strange . . . interest"):   Sustained.  Fed. R. Evid. 602.
- sentence 4 ("Lt. Sullivan . . . me"):         Overruled.
- sentence 5:                                    Overruled.

Paragraph 30

- sentence 1:                                    Overruled.
- sentence 2 ("In the face . . . Manual"):      Sustained.  Fed. R. Evid. 602.

5:12-cv-05436-HRL Notice has been electronically mailed to:

Ardell Johnson     CAO.Main@sanjoseca.gov

Nkia Desiree Richardson     cao.main@sanjoseca.gov

Thomas Kevin Bourke     TallTom2@aol.com, legalassistant@bourkelaw.com, mazizi@bourkelaw.com